MEMORANDUM OF DECISION
This memorandum of decision addresses a petition for termination of the parental rights (TPR) of Luz A. and Jose M. C., the biological parents of the minor children Jose C. and Luis C. Jose was born on April 24, 1990, and Luis was born on May 24, 1991. The Department of Children and Families (DCF) filed this TPR petition on September 29, 1999. The petition alleges two grounds for termination as to the respondent mother: parental failure to rehabilitate and lack of an ongoing parent-child relationship as to both Jose C. and Luis C. As to the respondent father, DCF also alleged two grounds: abandonment and no ongoing parent-child relationship as to both Jose C. and Luis C. For the reasons stated below, the court finds this matter in favor of the petitioner.
The file reveals that on April 11, 1997, the court approved DCF's petition for an order of temporary custody (OTC) affecting both boys (McWeeny, J.). On June 26, 1997, Jose and. Luis were adjudicated neglected children and were committed to DCF for a period of twelve months, following a hearing before the Superior Court for Juvenile Matters at Hartford (Teller, J.). Thereafter, on June 4, 1998, the court (McLachlan, J.) determined that further efforts to reunify the children with their father were not appropriate, and extended this commitment until June 26, 1999. On June 10, 1999, the commitment was extended to June 26, 2000 (Dyer, J.). On June 15, 1999, after an evidentiary hearing, the court determined that further efforts to reunify the children with their mother would not be appropriate (Dyer, J). In hand service of the TPR petition was effectuated as to the mother on October 10, 1999. On October 13, 1999, the court granted a motion for Order of Notice as to Jose M. C., and notice was published: this service was confirmed and the father was noted to be in default on October 26, 1999 CT Page 15527 (Keller, J.). On June 15, 2000, the court extended the children's commitment for an additional twelve months, to June 26, 2001 (Swienton, J.).
Trial commenced on October 2, 2000 and continued through October 3, 2000. The respondent father was absent from court.[2] The respondent mother, having received adequate notice of the proceedings, elected not to attend the court sessions, and chose instead to be represented by her court-appointed attorney, who expressly waived her client's presence, and who actively participated in all trial sessions.[3] See Practice Book § 33-4. The petitioner and the minor children were represented by their respective attorneys throughout the trial.
DCF elicited testimony from multiple witnesses, including social workers, a therapist, and psychologists; introduced multiple exhibits into evidence; and obtained the court's judicial notice of prior Juvenile Court orders affecting these children. Neither the respondent mother nor the children placed any exhibits in evidence, testified in court[4] or introduced the testimony of other witnesses, although their counsel provided vigorous and thorough cross-examination of the witnesses produced by the petitioner. The guardian ad litem (GAL) for the minor children was in attendance at each phase of this trial, and offered her report to the court prior to counsel's delivery of closing statements.[5]
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the child.
 I. FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study and psychological examination, and the testimony presented, according to the standards required by law.[6]
Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
A. LUZ A, THE MOTHER
 1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF JUNE 26, 1997
Luz A. was born on September 1972. As a young child, she was physically abused by her mother, and she was similarly abused by Jose M. C., whom she married when she was 15. Luz A. became separated from Jose M. C. approximately one month after the birth of Luis, due to Jose M. C.'s incarceration for drug involvement. (Petitioner's Exhibit 1, p. CT Page 15528 3-4.)[7]
Luz A. and her children[8] have been known to DCF since May 7, 1992. (Testimony of Elsie V.; Petitioner's Exhibit 1, p. 3.) Physical neglect was substantiated after a timely DCF investigation. (Petitioner's Exhibit 1, p. 3) Subsequent referrals to DCF arose from the presence of a third degree burn on Luis's back and reports that Jose was out of control. (Testimony of Elsie V.) In November of 1994, DCF again substantiated the neglect, but allowed the children to remain with their mother, and opened the case for services. In 1995, four separate allegations of substantiated physical abuse, attributed to Luz A., were made to DCF. DCF recognized that Luz A. was a single mother whose biological family resided in Puerto Rico, and which could not or would not provide support for her. The childrens' father, Jose M. C., remained incarcerated, and also was unavailable to provide support. (Testimony of Elsie V.)
Accordingly, multiple referrals were made for Luz A. to the Institute for the Hispanic Family, where she and her two sons received counseling. In addition, Luz A. was also referred to Klinberg Family Preservation Services. From November 1994 to April of 1997, DCF provided protective services to Luz A. and her children, while they resided with her. (Testimony of Elsie V.) Intensive case management services have also been provided by DCF (Testimony of Donaicis Alers).
A final report of physical abuse and neglect preceded DCF's removal of Jose C., Luis C. and Kassandra A. from their mother's care on April 7, 1997. The seventh and final report was received on that date from Christina Sideranko, a nurse at the Parkville School where Jose and Luis were then enrolled. (Testimony of Elsie V.) Luis, then nearly six years old, demonstrated the following injuries which were attributed to Luz A.: a severe human bite mark on his back; a bruise on his right cheek, ostensibly from being hit with a belt; a bruise behind his left ear, a cut on his lip, and welt marks on his back, chest and left nipple. His brother, Jose, then near his seventh birthday and presenting a fresh scratch on his face, reported that his mother had hit him on the face, and that an old injury to the back of his head had been caused when his mother hit him with the heel of a shoe, breaking the skin and causing bleeding. (Petitioner's Exhibit 1, p. 3; Testimony of Elsie V.) On April 11, 1997, DCF invoked a 96-hour hold on Jose, Luis and their sister Kassandra, and obtained the OTC referenced above.
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF JUNE 26, 1997
Specific court-ordered expectations for Luz A. were assigned on June 26, 1997 (Teller, J.). These expectations included participation in parenting, individual and family counseling; participation in anger CT Page 15529 management and domestic violence counseling; cooperation with a neurological and psychological/psychiatric evaluation for the children; visitation as often as permitted by DCF or Catholic Family Services; maintenance of adequate housing and income. (Petitioner's Exhibit 2.)
Luz A. had acknowledged to DCF that she had "a temper problem" that was made worse by Jose's behavior. (Testimony of Zaira R.) To address this problem and other issues, DCF offered a number of services to Luz A. The obvious goal of these programs has been to improve this respondent's parenting skills and her relationship with her children, with particular attention to the issues of anger management, family violence and maternal physical abuse, and to provide a basis for reuniting Luz A. with her children. However, it became apparent that Luz A. has significant skepticism about the value of mental health care providers and their therapy, and she would not attend treatment sessions unless she subjectively was comfortable with the therapist. (Testimony of Zaira R.)
It was reported without contest that Luz A. completed Catholic Family Service's Intensive Reunification and a 12-week parenting education and family violence program, although no specific documentation of these programs, information concerning the relevant curricula or content, or their date of completion was provided to the court. (Testimony of Zaira R.) Luz A. was offered individual counseling with the Institute of the Hispanic Family, and she reportedly attended a number of sessions of individual mental health therapy, although no specific testimony or written information concerning this therapy or its effect was provided to the court. (Testimony of Zaira R.)
Rafael Mora provided individual counseling therapy to Luz A. through the Multicultural Center, until she disagreed with his position regarding her reunification with Jose and Luis, at which time Luz A. refused to attend further sessions.[9] (Petitioner's Exhibit 1, p. 7; see also Petitioner's Exhibit 4, p. 9; Petitioner's Exhibit 3, p. 9.)
While Luz A. had expressed agreement to attend individual therapy sessions with another provider, her actions belied her actual intention to do so. On October 13, 1998, Luz A. was referred to another therapist at the Institute for Hispanic Families. However, she did not contact that agency until May 21, 1999, many months after the referral was made, and following several specific advisements from DCF that Luz A. needed to resume individual therapy in order for family therapy, and reunification, to occur. (Petitioner's Exhibit 1, p. 9.) While Luz A. claimed to have obtained treatment on her own from another counselor, neither testimony, records or reports of such treatment were provided for the court's review. Also, while DCF offered Luz A. an opportunity to participate in an anger management treatment program at Hartford CT Page 15530 Hospital, no documentation of her attendance at this program was provided to the court. (Testimony of Zaira R.)
DCF provided further services to Luz A., including in-home services from CREC parenting aid Rosa F. (Testimony of Zaira R.) Rosa F. worked with the respondent mother in her home, and attended the supervised visits with her sons that were provided by DCF at Catholic Family Services. In this capacity, Rosa F. instructed Luz A. on the issues of child development, appropriate maternal discipline, and methods of dealing with Jose's diagnosed Attention Deficit Hyperactivity Disorder (ADHD) condition. (Testimony of Zaira R.) Luz A. has successfully completed a program of prenatal and mother-infant parenting techniques sponsored by the Visiting Nurse Association, and has cooperated with the mother-infant outreach program related to her youngest child, her daughter Gaviota P. (Testimony of Donaicis A.) There was insufficient evidence from which the court could conclude that either of these two infant-related programs also provided instruction or direction in parenting techniques related to older children, such as Jose and Luis.
By 1998, Luz A. was allowed supervised visits with her children once a week, providing approximately one to one and a half hours of interaction time. (Testimony of Donaicis A.) At this time, Luz A. had so improved in her ability to parent Kassandra that DCF recommended unsupervised visitation between the mother and this daughter. (Testimony of Donaicis A.) No such improvement was shown in her ability to parent her sons. Luz A. perceived her visitation with Luis to be particularly hampered because she spoke Spanish and this child could not or would not do so: this perception must be addressed in the light of Luz A.'s completion of an English as a Second Language program in 1998. (Testimony of Donaicis A.)
DCF provided family counseling for Luz A., her sons and Kassandra at the Village for Families and Children. An initial session took place on June 29, 1998. (Testimony of Donaicis A.) Luz A. did not appear at subsequent scheduled visits, claiming that she was unable to attend because of travel difficulties with her new baby, Gaviota. However, Luz A. further avoided attendance at these family counseling sessions, even when DCF offered transportation for this respondent and her infant. (Id.) Following this session, Luz stated that she had been receiving mental health therapy all her life, and that she had not been helped at all by this process; in November of 1998, she indicated to DCF that she would not attend any further individual therapy sessions. (Id.)
On September 10, 1998, Luz A. stated that she did not want Jose returned to her care, but did want custody of Luis and Kassandra. (Id.) In September of 1998, Luz A. indicated that she wished to speak to a family therapist regarding the plans for placement of her sons. She had CT Page 15531 related to her current DCF social worker that she felt she would be unable to control herself with the boys if they were returned to her care, and that she therefore did not want them in her custody because it would increase the likelihood that she would lose her new daughter, Gaviota. (Testimony of Donaicis A.)[10] In December of 1998, Luz A. continued to reject participation in family therapy, and expressed her worry that she would lose control if she had custody of the boys. (Id.)
During the spring of 1999, a court-ordered interactional evaluation of Luz A. and her children was performed by Bruce Freedman, Ph.D. Dr. Freedman is a licensed clinical psychologist who has much skill and experience in forensic evaluations related to children and their parents, and a special expertise in the evaluation of children who have been victims of physical abuse. Dr. Freedman was thus enabled to observe and assess Luz A.'s parenting skills and her general relationship with the children who participated in the session. The court found Dr. Freedman's testimony to be logical, consistent, thorough and explicative of the evidence related to this family.
Dr. Freedman had examined the family on three prior occasions: in April of 1997, following noted physical abuse of the children by their mother; in August of 1997, addressing specific concerns raised by Luis, who expressed fear of his mother and who did not want to return to her care; and in November of 1998, to assess the relationship between Luz A., the children, and Jesse P., then the respondent's boyfriend and the father of Gaviota P.[11] (Petitioner's Exhibit 5, p. 1; Testimony of Dr. Freedman.) The current evaluations took place on March 13 and April 8, 1999, facilitated by the presence of an interpreter: these evaluations are the subject of Dr. Freedman's psychological evaluation report.[12]
On April 22, 1999, DFC reconfirmed to Luz A. that she was required to undergo individual therapy in order to obtain reunification with her sons. (Testimony of Donaicis A.) Following Luz A.'s recommencement of individual therapy, visitation was supervised by DCF staff or, later on, through the Catholic Family Services Reunification Program. On May 4, 1999, both Jose and Luis requested not to see their mother. (Petitioner's Exhibit 4, p. 2; Exhibit 3, p. 2; Testimony of Donaicis A.) Although DCF discontinued their visits with Luz A., the children have since requested several visits, few of which have taken place.[13] One visit was canceled because Luz A. was over half an hour late. (Petitioner's Exhibit 4, p. 7; Exhibit 3, p. 2; Testimony of Donaicis A.) On the second scheduled visit, Luz A. did not appear, claiming she could not attend because it was raining. (Testimony of Donaicis A.) Additional facts related to maternal visitation with Jose and Luis are set forth in Part I. A. 3., below. CT Page 15532
As noted above, on June 15, 1999, after an evidentiary hearing, the court determined that further efforts to reunify the children with their mother would not be appropriate (Dyer, J.).
 3. EVENTS FOLLOWING THE FILING OF THE TERMINATION PETITIONS ON SEPTEMBER 29, 1999
Luz A. last visited with her sons on June 26, 2000, approximately three years after their adjudication as neglected children. Thereafter, Luz A. would not cooperate with subsequent visits, claiming that Jose and Luis were determining the visitation schedule. (Id.; Testimony of Donaicis A.) In response to her perception that Jose and Luis were in charge of the visitations, Luz A. has forbidden her sons from seeing or visiting with their sisters. (Id.) Thus, sibling visits thus have not taken place during the last six months, despite DCF's offers to transport Kassandra and Gaviota to a meeting place outside the mother's home.
Since that time, notwithstanding her achievement of literacy, Luz A. has not communicated directly with her sons, nor favored them with regular written correspondence, cards, or other mementos of her existence, although she had sent birthday gifts to both boys, and a birthday card had been sent to Jose earlier in the spring. (Testimony of Donaicis A.) The evidence in this case does not allow a clear assessment of whether this behavior, on the part of Luz A., is attributable to her immaturity, to her emotional inability to comprehend the devastating effect her actions have upon her sons, or to a wilful and manipulative personality trait.[14] What is clear, however, is that this behavior, while causing psychological rather than physical trauma to her sons, demonstrates Luz A.'s consistent pattern of causing these boys to suffer the lasting effects of her conduct.
Kassandra now resides with her mother under DCF protective supervision. (Testimony of Donaicis A.)
B. JOSE M. C., THE FATHER
Jose M. C. has not been involved in the lives of his sons since 1991, when he was incarcerated for drug involvement shortly after the birth of Luis. (Petitioner's Exhibit 1, p. 3.) Despite service by publication, Jose M. C. has not participated in any of the court proceedings affecting his sons. From the evidence presented, the court concludes that Jose M. has never called to inquire about the progress or well-being of either Jose or Luis, had any visitation with them, sent any cards, letters or gifts, or paid any support for his sons.
C. THE BROTHERS, JOSE C. AND LUIS C.
CT Page 15533
Jose and Luis were initially placed in the same foster home after they were taken from their mother's care in April 1997. (Testimony of Zaira R.) In November of that year, due to his behavior problems, Jose was removed to a specialized foster home: he was noted to be oppositional with the original foster father and other children, and he had started a fire. (Testimony of Donaicis A.) In June of 1999, the boys were reunited in a single specialized foster home. They remain placed together, living comfortably and without noted conflict. Although Jose initially demonstrated out of control behavior in school, this has subsided with counseling and the attention of DCF and his foster families. (Testimony of Zaira R., Donaicis A.)[15]
During the initial period of separation from Luz A. and each other, DCF arranged for the boys to meet weekly, joined by Kassandra. All siblings demonstrated a healthy relationship during these visits, including those that occurred at their mother's home. (Testimony of Zaira R., Donaicis A.)
1. JOSE C., THE OLDER SON
At the time of his evaluation by Dr. Freedman in the spring of 1999, Jose had been in foster care for approximately two years. Dr. Freedman found "many strong signs that Jose remembered his mother as critical and abusive, found his foster placement gentle and supportive, and that he had not found his mother to have changed in her attitude or behavior sufficiently to have regained his loyalty and comfort." (Petitioner's Exhibit 5, p. 3.) Jose's descriptions of his mother's home and her treatment of him "suggested that he viewed her somewhat as an outsider. . . ." (Id.) However, in his foster placement at that time, although he was then separated from Luis, Jose appeared happy and well-adjusted. (Id., 3-4.) He "did not allow [his mother's] criticism or past mistreatment of him to affect his self-confidence or feelings about himself." Id. "He had no memory of his father. . . ." (Id., 3.) Jose reported a warm and loving relationship with his foster family. (Id., 3-4.) Results of Jose's psychological testing "indicated the same sense of healthy social and emotional development as came across in his individual interview."[16] (Id., 4.) Jose stated to Dr. Freedman that he did not want to return to live with his mother, but wanted to remain in his foster home. (Id., 3.)
After a formal psychiatric evaluation in June of 1998, Jose had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), for which he takes the medications Ritalin and Klonapin.[17] (Id.; Testimony of Donaicis A., Jacqueline Z.) He is a mandated special education student, receiving special services at school in an effort to help him address his CT Page 15534 learning delays. (Petitioner's Exhibit 4, pp. 4, 5.) Jose has received treatment or participated in counseling through the Institute of Living Day Treatment Center, under the service of Dr. Aponte Slater; and through the Village for Families and Children, under the service of Dr. C. S. and Jacqueline Z., M.S.W. Jose had two therapeutic sessions with his mother: other sessions were not scheduled both because Luz A. had so requested, and because the sessions would not be effective until Luz A. had received appropriate individual therapy. (Id.; Testimony of Jacqueline Z.)
Jacqueline Z., who has served as Jose's individual therapist since 1998, provided probative and credible testimony at trial. Initially she met with Jose every week, but his condition has improved so that meetings are now needed only every other week. (Testimony of Jacqueline Z.) Jose's major presenting problem was ADHD; the therapist's goal was to improve his behavior, and to reduce the anxiety that he suffered due to separation from his mother and his sisters. (Id.) With therapy and medications, Jose has decreased his impulsive behavior, and increased his ability to concentrate. He has become able to verbalize his feelings in a socially appropriate manner. These improvements have been developed notwithstanding his persisting fear that he will be hit again by his mother and his anxiety concerning the outcome of these court proceedings.[18] (Id.)
2. LUIS C., THE YOUNGER SON
At the time of his evaluation by Dr. Freedman in the spring of 1999, Luis also had been in foster care for approximately two years. He appeared to be bright-eyed, enthusiastic, and eager to cooperate with the psychologist. (Petitioner's Exhibit 5, p. 4.)[19] Luis also stated that he did not want to return to the home of his mother and her boyfriend, but that he wanted to remain in his foster placement. (Id., 4.) With regard to his relationship with Luz A., Luis expressed that he still had fear of his mother, especially "when she yelled, because of how she was in the past." Id., 4.) Luis reported that "his mother never admitted she had hurt him, never apologized, and seemed to act as if she had never done anything wrong." (Id., 5.) Dr. Freedman found that Luis's interview showed he was "more troubled and affected by the past abuse than his older brother. He seemed still very concerned about good and bad behavior, about punishment, and he seemed subject to build up of anger, resentment, and resulting misbehavior." (Id.) Utilizing a narrative-based test, Luis manifested "signs of lingering emotional behavior problems caused by past abuse. . . . Luis' stories depicted a repeating theme of cycles of misbehavior, punishment, anger and resentment, leading to further misbehavior. Such a cycle is sometimes seen in abused children, whose resentment and misbehavior can in turn cause them to become targets for further abuse. Despite a lengthy placement and therapy, Luis was CT Page 15535 still focused on his fear of his mother, and difficulties in trusting and feeling safe with adults." Id. These findings explain Luis's use of the English language during visitation sessions with Luz A., as it creates a protective barrier insulating him from her presence, her current and her past behaviors. (Testimony of Dr. Freedman.)
Luis receives therapy for behavior problems, lack of self-esteem, inability to verbalize his feelings, and to otherwise address the expressed fear of his mother. (Petitioner's Exhibit 3, p. 4.) His individual counseling has been delivered by the Village for Families and Children, primarily through a staff psychologist. Dr. S., who last saw Luis on May 12, 2000, has been treating him for problems specifically related to the physical abuse he received from his mother, which represents her area of specialization.[20] (Testimony of Dr. S.) In the past, she provided weekly treatment to Luis: due to his improvement, therapeutic visits were decreased to every other week. (Id.)
Dr. S., who tendered cogent, detailed and credible testimony at trial, has diagnosed Luis as suffering from chronic anxiety, adjustment and mood disorders. These conditions were caused by the trauma of his mother's physical abuse as to himself and to Jose, abuse that he was not able to control by stopping the behavior, or through handling his own emotions. This abuse had made him feel scared, hurt and sad, caused him to develop an intense need to scrutinize his environment, and to apply any technique he could to lessen the effect of that environment if it offended him in any way. (Testimony of Dr. S.) His inability to handle these experiences, and the difficulties in expressing his feelings that were a part of his formerly shy and timid personality, led him to explosive behavior in the past. (Id.) While these outbursts occurred at least once a month in prior years, Luis is now in a position where he is able to calm himself, to channel appropriately the emotions he feels, to communicate his feelings with trusted adults, and thus to completely bypass his negative behaviors. (Id.)
 II. ADJUDICATION
As to the adjudicatory phase of this hearing of the petition for termination of parental rights,[21] the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on June 26, 1997 and until September 29, 1999, when the TPR was filed. The court has determined that a statutory ground for termination exists.
A. LOCATION AND REUNIFICATION
With respect to the statutory element of location and reunification, CT Page 15536 required for termination pursuant to General Statutes §17a-112(c)(1),[22] the court finds the following to have been established by clear and convincing evidence:
1. LUZ A., THE MOTHER
As noted, Luz A. participated in the trial of this matter through the presence of her counsel, having elected not to attend court sessions. Although she was apparently physically able to be present, she explained, through counsel, that her employment obligations took priority to this trial.
With regard to Luz A., the court is not obligated to assess reunification attempts, as it had been determined at a hearing before the court "that such efforts are not appropriate." § 17a-112(c)(1). See Order of June 15, 1999 (Dyer, J). Additionally, upon evaluating the circumstances of this case, the court does find, from the clear and convincing evidence concerning the multiple counseling and family therapy services offered to her and noted herein, that DCF made reasonable reunification efforts concerning this mother and her sons, both prior to and following the filing of the termination petition. These efforts included: counseling at the Institute of the Hispanic Family; Klinberg Family Preservation Services; Catholic Family Services' Intensive Reunification program, parenting education and family violence programs; individual counseling at the Multicultural Center; family counseling at the Village for Children and Families; CREC parenting aide; supervised visitation; transportation assistance; and visitation coordination. Such efforts were, however, fatally hampered by Luz's unwillingness to benefit from services and her lack of participation and cooperation with DCF or the counseling and therapy provided.
2. JOSE M. C., THE FATHER
Reasonable efforts have been made to locate Jose M. C., who was not available to the court for participation in these proceedings. Those efforts included DCF's contact with the Department of Correction, and determination that he was discharged on November 12, 1995; he has not since been incarcerated. Additional contacts with the Office of Adult Probation and the Bail Commissioner indicated that Jose M. C. has not recently been arrested. The Department of Social Services indicated that Jose M. C. is not receiving assistance benefits through that agency. There is no listing of any telephone service for this father published in the telephone directory. Luz A. indicated that she believes that Jose M. C. resided with his mother, but she was unable to provide any address or telephone number at which either could be reached. CT Page 15537
The court was not obligated to assess reunification attempts with regard to Jose M. C., as it had been determined at a hearing before the court "that such efforts are not appropriate." § 17a-112(c)(1). See Order of June 4, 1998 (McLachlan, J.).
B. STATUTORY GROUNDS FOR TERMINATION
With respect to the statutory grounds for termination of parental rights, the court finds the following to have been established by clear and convincing evidence:
1. LUZ A., THE MOTHER
 a. PARENTAL FAILURE TO REHABILITATE — § 17a-112(c)(3)(B)
The petitioner claims that the statutory ground of parental failure to rehabilitate exists in this case, supporting the application for termination of the respondent mother's parental rights pursuant to General Statutes § 17a-112(c)(3)(B).[23] While Luz A. has partially attended to some of the court-ordered expectations, the overwhelming evidence establishes that as of September 29, 1999, she had neither accomplished such personal rehabilitation as is contemplated by §17a-112(c)(3)(B), nor had she achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her child, she could assume a responsible position in the lives of Jose or Luis. Accordingly, the court finds this issue in favor of the petitioner.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999).] . . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In re Shyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165
(1999)." In re Sarah Ann K., 57 Conn. App. 441, 448, ___ A.2d ___
(2000). Thus, "[a]t the adjudicatory phase of the termination hearing, CT Page 15538 the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the child's commitment." (Citation omitted; footnote omitted). In re HectorL., 53 Conn. App. 359, 367, 730 A.2d 106 (1999).
In this matter, Luz A. had services made available to her as early as April of 1997, when her two sons were the subject of the neglect petition filed with the Superior Court for Juvenile Matters in Hartford. As noted, those services were directed at meeting the specific expectations issued by the court on June 26, 1997, which included successful individual and family counseling as a predicate to reunification. Luz A.'s cooperation with those services affecting her sons could best be described as desultory, although she demonstrated a more committed, and far more successful, record with services directed at her daughters.
Despite all that has been offered to her, Luz A. continually resisted the efforts of DCF and the mental health professionals who sought to assist her in developing insight into the basis for her pattern of violence and physical abuse of her sons. She was unable to recognize herself in the appropriate parental role, or to identify her own actions as the catalyst in the abusive episodes that marked the bodies and minds of her young sons while they lived in her household. Instead, she persisted in ascribing blame to these children, holding them, and not herself, to task for having caused the physical abuse to occur. (Testimony of Dr. Freedman.) She remains unwilling, or unable, to communicate with either Jose or Luis in a manner conducive to a healthy mother-son relationship, although she is clearly able to demonstrate affection for her daughters. It has been suggested that Luz A. simplylikes girl children better than boy children, or that she has a bias toward girls and against boys in terms of trying to manage their behavior: while these hypotheses may represent interesting explanations for Luz A.'s conduct toward her sons and her resistance to individual counseling, it is clear that she lacks the ability and/or the interest to serve as an effective parent for her sons.[24]
Dr. Freedman's opinions, which were based upon his long familiarity with the family, his more recent observations, his training and expertise, were thoughtfully and logically drawn and presented. No expert testimony was submitted in opposition to Dr. Freedman's opinions, which were consistent, related to the evidence, and credited in full by this court.
Dr. Freedman's 1999 evaluations took place almost two years after the court had established expectations that the respondent mother participate in counseling to address parenting, family, individual, and anger CT Page 15539 management/domestic violence needs. The personality testing he conducted upon Luz A. (Rorschach, Exner scoring) yielded results which showed her limited mental organization, poor judgment, immaturity and emotional inhibition. (Petitioner's Exhibit 5, pp. 2-3.) With regard to judgment, her psychological test results indicated that she "would often have difficulty seeing things as other people did, and others would find her ideas or assessments unconvincing or peculiar." Id. While she denied having bitten Luis, Luz A. admitted to Dr. Freedman that she had hit her children, "and felt she had no reason to deny this. She said that the hitting was justified, because of their behavior, especially that of Jose." Id., 2. While Dr. Freedman found that Luz A. "had made improvements in her life, and participated in psychotherapy [, s]he had never been able to repair her relationships with the boys, and this seemed a combination of the boys' lingering feelings toward her, as well as her own stubbornness and difficulty in repairing past damage or taking responsibility for this." Id., 11. Clinically, he diagnosed her with emotional immaturity and noted that she continued having difficulty in accepting the fact that her temper had a harmful effect upon her children, particularly her sons. (Testimony of Dr. Freedman.)
Dr. Freedman's evaluation revealed that Luz A. had acquired appropriate parenting skills, but that these skills were demonstrated only with regard to Kassandra, and were not manifest or applied in her relationship with either Jose or Luis. (Petitioner's Exhibit 1, p. 7.) While he found this respondent to have real affection for and attachment to Kassandra, there was a poor or absent relationship with the boys, as was evident in her inability or disinterest in engaging in conversation or activities appropriate for their age and capacities. (Petitioner's Exhibit 5, pp. 6, 7, 8.)[25] In Dr. Freedman's opinion, both Jose and Luis express fear of Luz A. based upon her past abuse and their insecurity about a future in her care. (Petitioner's Exhibit 5, p. 8.) While the boys recognized Luz A. as their mother, they have "expressed their rejection of her articulately, and made it clear they did not trust her or want to live with her." Id., 10.
The statutory framework created by General Statutes §17a-112(c)(3)(B) requires the court not only to analyze the parent's rehabilitation as it relates to the needs of these particular children, but also to consider if such rehabilitation is foreseeable within a reasonable time. In re Hector L., supra, 53 Conn. App. 367 366-467. Because of this requirement that the court predict what may happen within a reasonable time after the filing of the petition for TPR, the court must consider not only Luz A.'s conduct prior to the filing of those petitions, but also her conduct after that time. In this case, this was a period of some twenty-seven (27) months, during which time Luz A. made little discernable progress in her personal rehabilitation process. CT Page 15540
Given the long period of time DCF worked with Luz A. without progress of any note toward rehabilitation, first by providing her with anger management and family violence counseling, with educational support services, and with efforts at family and individual therapy both before and long after Jose and Luis were removed from the home in 1997, this court is persuaded that Luz A. will not become rehabilitated soon, if ever, as to these two children. Both Luz A.'s abject failure as a parent to her sons, and her inability to develop insight into the fact of her history of physical abuse toward these children, have prolonged the period of uncertainty and instability in which Jose and Luis have been placed. The long period of time during which efforts were made for their mother, without any resolution of the issue of maternal rehabilitation, has contributed to Jose's and Luis's emotional difficulties, without any resulting benefit to the children. Luz A.'s demonstration of enmity toward her sons, in the way of depriving Jose and Luis of the opportunity to spend time with their cherished sisters, is only the most recent demonstration of her ability to abuse these children, and her inability to reasonably parent them.
To her credit, Luz A. has successfully met some aspects of the court-ordered expectations. She earned her G.E.D., and has been employed for approximately a year and a half at Beauty Enterprises, performing warehouse work from 7am to 3pm. (Petitioner's Exhibit 1, p. 4, 7; Testimony of Donaicis A.) These achievements do not overcome, however, this mother's failure to demonstrate, over a period of more than three years, that she has the ability to fulfill her sons' needs for stability and affection, or their need to abate their persisting fears related to physical abuse. The court credits Dr. S.'s opinion that Luz A. "will not be able to fulfill those needs in the near future."[26] (Id.)
Upon consideration of all the evidence provided to the court, it is clear that Luz A. has not achieved the rehabilitation that would make her an appropriate candidate for provision of maternal services to either of her sons.[27] Despite the passage of time, and all the services that have been provided, Luz A. still lacks the skills and attributes necessary to serve as the mother of either Jose or Luis. The evidence clearly and convincingly demonstrates that she has not achieved a level of rehabilitation which would reasonably encourage a belief that at some future date she can assume a responsible position in the lives of these children. In re Eden F., supra, 250 Conn. 706.
b. NO ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
The petitioner further claims that the statutory ground of no ongoing parent-child relationship exists in this case as to Luz A. and her sons, CT Page 15541 further supporting the application for termination of the respondent mother's parental rights pursuant to § 17a-112(c)(3)(D).[28] The clear and convincing evidence in this case establishes that there is no ongoing parent-child relationship between Luz A. and either Jose or Luis, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the Jose and Luis child. As discussed in Part III., below, to allow further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to the best interests of the children. Accordingly, the court finds this issue in favor of the petitioner.
Jose is now ten years old, and Luis is nine. At the hearing of this TPR, both children had been in DCF foster care for over three years. During this time, although Luz A. had been afforded reasonable opportunities for visitation with her sons, she elected not only to curtail the scheduled visits, but to withhold her care and attention even when she was in their presence. While Luz A. has been separated from her sons, DCF has made appropriate efforts to facilitate an ongoing parent-children relationship, proffering counseling, therapy and visitation sessions. Luz A. has not made reasonable use of the time she was allotted with these boys. She has missed family counseling sessions, and has failed to appropriately interact with her sons when she has attended those sessions. She has demonstrated her inattention to the boys in the presence of Dr. Freedman, the court-appointed evaluator, and in the presence of the childrens' therapists.
There has been no change in Luz A.'s lack of manifest interest in the boys from their adjudication as neglected children, on June 26, 1997; to the date of the termination petition, September 29, 1999; to the final visits with her sons in the spring of 2000. In view of these circumstances, the court further finds that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the children.
2. JOSE M. C., THE FATHER
 a. ABANDONMENT — § 17a-112(c)(3)(A)
The petitioner claims that the statutory ground of abandonment exists in this case as to the respondent father, pursuant to General Statutes § 17a-112(c)(3)(A).[29] As noted above, the uncontroverted evidence establishes that Jose M. C. has had no contact with his sons since Jose was one year of age and Luis was but one month old. Jose M. C. has never visited these children, nor has he contacted them through mail or other resources. He has paid no financial support for his sons and has not CT Page 15542 provided any emotional guidance or assistance to them. The clear and convincing evidence in this case demonstrates that Jose M. C. has abandoned both of these children, in the sense that this parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of either Jose or Luis. Accordingly, the court finds this issue in favor of the petitioner.
b. NO ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
The petitioner further claims that the statutory ground of no ongoing parent-child relationship exists in this case as to Jose M. C. and his sons, further supporting the application for termination of the respondent father's parental rights pursuant to §17a-112(c)(3)(D).[30] The clear and convincing evidence in this case establishes that there is absolutely no ongoing parent-child relationship between Jose M. C. and either Jose or Luis, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. As discussed in Part III, below, to allow further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to the best interest of the child. Accordingly, the court finds this issue in favor of the petitioner.
 III. DISPOSITION
As to the dispositional phase of this hearing,[31] the court has considered the evidence and testimony related to circumstances and events up to and including October 3, 2000, the date upon which the evidence in this matter was concluded.
A. SEVEN STATUTORY FINDINGS
With respect to the seven written factual findings required by General Statutes § 17a-112(d), the court has recorded its findings below. The court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[32]
 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(d)(1)
As to the timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion Jose and Luis with their biological mother and father, as noted above, the court has previously found that such efforts would be inappropriate as to each parent. In addition, the court now finds by clear and convincing evidence that appropriate and timely services were CT Page 15543 provided to Luz A. by DCF, including: domestic violence, anger management and individual counseling at the Institute of the Hispanic Family (Multicultural Center); individual counseling with Rafael Mora; Catholic Family Services' Intensive Reunification program, parenting education and family violence programs; family counseling at the Village for Children and Families; CREC parenting aid; supervised visitation; transportation assistance, and visitation coordination.[33] § 17a-112(d)(1). (Petitioner's Exhibit 6.)
2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112(d)(2)
As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court again notes the conclusions by prior courts that reunification efforts are inappropriate as to both Jose M. C. and Luz A. Additionally, this court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the parents with Jose and Luis, given the situation and circumstances here existing including the unavailability of Jose M. C., and accounting for Luz A. "s persistent failure to recognize her role in the physical abuse of her sons that occurred in the past, and which continues to affect these children even at the present time. § 17a-112(d)(2). The court notes that DCF has offered and provided services as outlined above, and as more specifically referenced at trial and in the Social Study. (Petitioner's Exhibit 1.) The court finds that the action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to secure permanent placement for children, such as Jose and Luis, who have been placed in foster care.
3. COMPLIANCE WITH COURT ORDERS — § 17a-112(d)(3)
As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order, entered into and agreed upon by any individual or agency and the parent, the court notes that Jose M. C. has not been a party to any such orders. The court finds, however, that DCF, with the approval of the courts, established reasonable and realistic expectations as to the respondent mother on June 26, 1997, in order to facilitate reunification of the family. The court further finds by clear and convincing evidence that Luz A. complied with some of these expectations, but that she failed to adequately comply with those expectations intrinsically related to improving her parenting skills insofar as her sons are concerned. See § 17a-112(d)(3).
In reaching this conclusion, the court has considered the totality of Luz A.'s status from the commencement of the neglect petition, up until CT Page 15544 the filing of the termination petition, and again through the close of the evidence in this matter. Although ordered to visit with Jose and Luis as often as permitted, from April of 1998 through June of 1999, Luz A. provided inadequate reasons for her failure to attend almost one third of the scheduled supervised visits. (Petitioner's Exhibit 7.)
Although Luz A. has apparently successfully completed a parenting training program, earned her graduate equivalency degree, and allowed the visiting nurse and outreach providers to deliver services to her and to her daughters, there is insufficient evidence from which the court could conclude that she has actually benefitted from these services in a way that would meaningfully enable her to serve as a suitable parent for either Jose or Luis. To the contrary, the persistence of this mother's need to place upon her sons the blame for physical abuse that took place in the past serves as clear and convincing evidence that Luz A. is not now, nor within a reasonably foreseeable time will she be, able to parent her sons. On balance, Luz A. has failed to adequately comply with the court orders issued in this matter.
4. FEELINGS AND EMOTIONAL TIES OF THE CHILDREN — § 17a-112(d)(4)
As to the feelings and emotional ties of Jose and Luis with respect to their biological parents and their current foster parent, who has exercised physical care, custody or control of each child for at least one year, the court finds by clear and convincing evidence that both children have developed strong emotional ties with their current foster mother. The court finds, as well, that this foster parent has provided the physical, emotional and educational support needed by both children, and that she wishes to provide long-term foster placement for the children in her home.[34] Furthermore, the court finds, by clear and convincing evidence, that the children have no emotional ties to Jose M. C., their biological father, who scarcely figures in Jose's memories and who has never been known to Luis. The court also finds, by clear and convincing evidence, that Jose and Luis have developed a bond which represents true brotherly love, and that this bond has flourished during the time that they have resided together in their foster home during June of 1999. (Testimony of Donacais A.)
As to Luz A., the court finds that both boys have some positive feelings about their mother, and that Jose's relationship with his mother has been described as a "bond". (Testimony of Jacqueline Z.) The court further finds that each of the boys has developed an idealized view of her position in their lives. Each boy has specific present recall of the physical abuse and family violence that their mother wrought upon them during their early years in her household. This recall represents reality: the idealized view represents the sweet dream of two young boys CT Page 15545 who have suffered physical abuse by their mother, and who have long endured the emotional turmoil that necessarily flows from that experience. The court has thus concluded that neither boy manifests a positive relationship with Luz A. which is based on any aspect of reality, and that any emotional ties they have with their biological mother is based only upon a fantasy that can never be fulfilled. (Testimony of Dr. Freedman.) See § 17a-112(d)(4).
5. AGES OF THE CHILDREN — § 17a-112(d)(5)
As to the age of the children who are the subject of this petition, Jose was born on April 25, 1990, and is approximately 10.5 years of age. Luis was born on May 24, 1991, and is approximately 9.5 years of age. The court finds, based on the clear and convincing evidence presented at trial, that these children require stability of placement and continuity of care in order to maximize their opportunity for healthy development and a well-adjusted childhood. Both Jose and Luis require closure of the issues related to whether or not their biological mother will be able to assume a responsible position in their lives within in a reasonable period of time: the court has answered this question in the negative, given the "age and needs of the [children]." In re Hector L., supra,53 Conn. App. 366-67.
 6. EFFORTS MADE BY THE PARENTS TO ADJUST CIRCUMSTANCES — § 17a-112(d)(5)
As to the efforts that each parent has made to adjust his or her circumstances, conduct or conditions to make it in the best interest of either or both of these children to return to their home in the foreseeable future, the evidence in this case clearly and convincingly indicates that Jose M. C. has failed to maintain contact with his sons or with their foster families. Luz A. has maintained some contact with both Jose and Luis, in an effort to reunite with these children, but this contact may best be described as incidental or programmed in nature. While Luz A. attended weekly visits with her sons for a long period of time, she evinced no objection to their decision, in May of 1999, to discontinue these meetings. In addition, the court received no evidence that Luz A. communicated with her sons or made significant contributions to their well-being, even when she attended the scheduled visits. Although she has been employed for some time, for instance, there was no evidence from which the court could conclude that Luz A. sent her children regular written correspondence, holiday greetings, or gifts. Similarly, there was no evidence from which the court could conclude that Luz A. made any inquiries about her sons and their schoolwork or personal lives, by using the DCF caseworkers as a conduit. The overall inference is that Luz A. was actually indifferent to her sons and their state of CT Page 15546 being, when she was not in a position to criticize their behavior or to ascribe blame to them for the difficulties she was encountering with regard to regaining custody of her children.
The court further finds that Luz A.'s failure to make appropriate use of the individual and family therapy programs offered her indicates that she has not made meaningful or sustained efforts to conform her conduct to even minimally acceptable standards for parents of children who have suffered physical abuse, as have Jose and Luis, within the contemplation of § 17a-112(d)(6). Giving her additional time would not likely bring her performance, as a parent, within acceptable standards sufficient to make it in the best interests of the children for them to be reunited with their biological mother. See In re Michael L., 56 Conn. App. 688,694, 745 A.2d 847 (2000), citing In re Luis, 210 Conn. 157, 167,554 A.2d 722 (1989) (respondent's rehabilitation must be foreseeable within a reasonable time, given the needs of the particular child).
 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112(d)(6)
As to the extent to which either parent has been prevented from maintaining a meaningful relationship with either Jose or Luis, by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence that while the respondent mother's means were limited, economic factors did not prevent regular, continuing contact with either the children or the foster family. There is no positive relationship at present between Luz A. and the current foster mother. (Testimony of Donaicis A.) The children and their mother apparently lived in reasonable geographic proximity, as visitation was effectuated from time to time through DCF's provision of transportation services byway of automobile or bus, until both the boys and their mother asked that visitation be discontinued. DCF encouraged contact between Luz A. and her sons, and continued to provide supervised visitation even when one of the children refused to attend visits.[35]
However, the respondent mother, showed no more than sporadic interest in maintaining a relationship with her sons, absenting herself from a significant number of scheduled visitation sessions. See In re Rayna M.,13 Conn. App. 23, 26, 534 A.2d 897 (1987). No unreasonable conduct by the child protection agency is noted.
B. BEST INTERESTS OF THE CHILDREN — § 17a-112(c)(2)
The court is next called upon to determine whether it would be in the best interests of Jose and Luis to terminate the parental rights of Luz A. and Jose M. C.[36] The court finds this issue in favor of the CT Page 15547 petitioner.
The court has paid close heed to the GAL's report that while she initially believed that reunification with Luz A. was in the best interests of her wards, her opinion has been modified as the result of the respondent mother's behaviors over the past several months. Luz A.'s capricious conduct during the spring of 2000, ascribing responsibility to her sons for the scheduling of visitation, and depriving them of the opportunity to spend time with their sisters, indicates the existence of "mother-son" relationships which the GAL demurely described as "unusual." At the present time, Jose and Luis are not of one mind as to the issue of reunification with their mother. Jose apparently has recently indicated his desire to remain with his foster mother, while Luis still desires to be united with Luz A.
Now, however, the GAL is of the opinion that the rights of these two parents should be terminated as to both Jose and Luis, and she has so recommended to the court. In fulfillment of her obligation to Jose and Luis, the GAL has recognized, as should the court, that these boys can only achieve stability in their lives by formally disconnecting their damaged relationship with their biological mother, so that they can move on to the future in a secure setting. In reaching her opinion, the GAL has acknowledged the relative disadvantages of foster care and weighed them against the potential harm the boys would suffer if they continue to be exposed to their mother's deleterious behavior. Thus, although security for Jose and Luis may come in the form of permanent assignment as wards of DCF, with placement together in foster care, in the view of the GAL, this represents the best available option for her wards, the sons of Luz A. and Jose M. C. Thus, in this matter, considering all the issues noted above, the GAL has recommended termination of both parents' rights to both of the children. The court concurs with the GAL's sage analysis of the issues confronting Jose and Luis, and adopts her recommendations.
The evidence clearly and convincingly establishes that Jose sincerely desires a stable and secure environment in which to live: such environment is offered by his current foster home. (Testimony of Jacqueline Z.) His therapist emphasized Jose's repeated statements to the effect that he wishes to stay with his foster mother. (Id.) Jacqueline Z. has observed the foster parent with Jose on a number of occasions, and found that they were mutually affectionate with each other. (Id.) The court finds that this displayed affection is consistent with Jose's comfort level in his foster mother's household, and with his expressed desire to remain placed with her.
As to Luis, the credible testimony provided by Dr. S., based on her CT Page 15548 long treatment of this child and the multiple sessions in which Luz A. was observed interacting with her sons, clearly and convincingly establishes that reunification is no longer an appropriate goal, as Luis is still "not ready to return home to his mother."[37]
(Testimony of Dr. S.) Luis continues to fear the unknown effects of life with his mother, based upon her prior pattern of physical abuse. Luz A. remains stagnant, distant, silent, and unable to reach out to her son or to interact with Luis in a positive manner, despite all of the counseling services that have been offered to her. (Id.) Thus, despite all of Luis's improvements in therapy, his development of calm personality traits, and the discontinuation of the outbursts that plagued his younger years, Luz A. still cannot serve as an appropriate caretaker for this child. (Id.) Termination of Luz A.'s parental rights will serve Luis's best interests because this will remove the persistent element of indecision that marks his mother's continued lack of progress in family or individual therapy. In the psychologist's words, "To wait any longer would be detrimental." (Id.)
The GAL acknowledged, as does the court, the children's relative indecisiveness regarding their preferences as to placement. Jose, the elder sibling, appears to have resolved this issue for himself by requesting the opportunity to remain in his foster home. He shared this position with the GAL, knowing that this information would be delivered to the court. Luis, the younger sibling, is ostensibly still interested in residing with his biological mother and under her care. As indicated in Part III. A. 4., however, this interest is based upon fantasy, and not upon a realistic understanding of Luz A.'s actual situation. In addition, Luis has indicated his preference for staying in the same household as his brother, Jose, with whom he has a close bond: this preference is based upon Luis's realistic view of the circumstances.
The children's vacillation as to whether they wish to reside with their mother is based upon their psychological need to show her that they are "good children" who deserve her care and affection. (Testimony of Dr. Freedman; see also Testimony of Dr. S.). Dr. Freedman reasonably explained the children's relationship with their mother in 1999 as follows: "for the most part, their relationship was very damaged." (Id.) It is the children's impression that if they express a desire to be reunited with their mother, she will reward this expression with love: on the contrary, if they express a desire to remain in foster care, they anticipate that their mother will see them as "bad children" who are not acceptable to her.[38] (Testimony of Dr. Freedman, Dr. S.) The boys' statements that they wish to return to their mother's home is, accordingly, best viewed as a valiant, but hopeless, effort on their part to demonstrate their desire to please Luz A., an effort that she is still too immature, and too self-centered, to acknowledge in a way that will CT Page 15549 provide succor and stability for her sons. (Id.)
The court further adopts the well-reasoned and unqualified opinions of the mental health care providers who have stated that the termination of parental rights would have significant benefits for both Jose and Luis. (Testimony of Dr. Freedman, Jacqueline Z.) Termination will end their "toxic" relationship with their biological mother, enable them to engage in a stable and secure setting from which to face their impending adolescence and teenage years, and protect both Jose and Luis from the potential that Luz A. would otherwise attempt to interfere with their lives in the future. (Testimony of Dr. Freedman, Jacqueline Z., Dr. S.) While Jose and Luis are now functioning quite well, it is clear that their ability and willingness to trust adult authority figures is newly developed and thus fragile. This ability to trust others, a most coveted aspect of healthy living, will remain threatened through their childhoods if Luz A. is enabled to maintain a legal claim to her sons. (Testimony of Dr. Freedman.)
It is not likely that Jose and Luis will be adopted by the foster parent with whom they currently reside, despite her affection for them both. DCF continues to search for a home that will accept both children for adoption, but plans to keep the children in their present foster residence if an adoptive home is not found.[39] (Testimony of Donaicis A.) It is important that these siblings be maintained in the same household, so they will be enabled to build the sense of union and family that is an integral part of a healthy childhood experience. As Dr. Freedman and the boys' therapists have insisted, given their circumstances and present ages, whether Jose and Luis remain in long-term foster care or together in an adoptive home, their health will best be preserved if they are allowed to remain together. The children miss seeing their sisters, particularly Kassandra, with whom they developed a strong fraternal bond, and whom they would like to see on a frequent basis. (Testimony of Donaicis A.)[40] The brothers' bond does not, in the credible and consistent opinion of the mental health care professionals who testified in this matter, overcome the need for Luis and Jose to live in a home separate and apart from their mother.[41]
(Testimony of Dr. Freedman, Jacqueline Z. and Dr. S.)
It is clear that Jose and Luis thrive in the absence of their mother, who continues to view them with a jaded eye. Luz A. poses a very significant threat to these boys by her presence physically and in their memory. At the time of his evaluation in 1999, some years following the abuse to which they had been subject at the hands of their mother, both Jose and Luis remained fearful of their mother's anger and her ability to abuse them. While they recognized Luz A. as a parental figure, their psychological evaluation also showed that they consistently viewed her as CT Page 15550 being dangerously out of control, physically abusive, and the cause of persisting negative memories. (Testimony of Dr. Freedman, Jacqueline Z.) While, as Dr. Freedman noted, termination of parental rights is never a happy experience for any party, and there are always losses as the result of such court action, the important fact in this case is that permanently keeping Luz A. out of her sons' lives is the most effective manner of ensuring their healthy childhood and ability to live as well-adjusted adults (Id.; see also Testimony of Dr. S., Jacqueline Z.). It is in the best interest of these children that the parental rights of Luz A. and Jose M. C. be terminated by the court, even if the ideal of continuing a relationship with Kassandra and Gaviota cannot, thereby, be achieved. (Id.)
Thus, with respect to the best interests of the child contemplated by General Statutes § 17a-112(c)(2),[42] based upon all of the foregoing, in eluding the recommendations of the GAL and the mental health care providers who presented their consistent opinions in this case, and with due consideration to the findings set forth herein, the court concludes that termination of the parental rights of Luz A. and Jose M. C. is in the best interest of the children, Jose C. and Luis C.
 IV. ORDER OF TERMINATION
The court finds, by the clear and convincing testimonial and documentary evidence presented, that it would be in the best interests of Jose C. and Luis C. to terminate the parental rights of Luz A. and Jose M. C. at this time. In making this finding, the court has considered the children's sense of time, their need for a secure and permanent environment free from the spectre of maternal reunion, the relationship that the children have with their foster mother at this time, and the totality of circumstances.
As the termination of the parental rights of Luz A. and Jose M. C. is in the best interests of these children, accordingly ORDERS:
That the parental rights of Luz A. and Jose M. C. are hereby terminated as to Jose C. and Luis C.
That the Commissioner of the Department of Child and Families is hereby appointed the statutory parent for Jose C. and for Luis C., for the purpose of securing an adoptive family or other permanent placement for these children.
That within thirty days of this judgment a written report addressing such permanency plan shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and CT Page 15551 federal law. The permanency plan must address, as a priority item, the expressed need for Jose and Luis to remain in residence together whether in long-term foster care, or in an adoptive placement.
BY THE COURT,
N. Rubinow, J.